MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: STANLEY J. OKULA
   BARBARA A. WARD
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Tel.: 914-993-1961 / 212-637-1048



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      Plaintiff,

  -against-

ALL RIGHT, TITLE, AND INTEREST IN:

ANY AND ALL SHARES OF STOCK AND ANY
OTHER INTEREST IN BRYANSTON GROUP,
INC. HELD IN THE NAME OR FOR THE BENEFIT
OF BEATRICE N. TOLLMAN OR STANLEY S.
TOLLMAN;

ANY AND ALL SHARES OF STOCK AND ANY
OTHER INTEREST IN T.H. COURT CORP. HELD
IN THE NAME OR FOR THE BENEFIT OF
STANLEY S. TOLLMAN; and

ANY AND ALL PARTNERSHIP INTEREST AND
ANY OTHER INTEREST IN T.H. COURT
**LIMITED LIABILITY PARTNERSHIP HELD IN**
THE NAME OR FOR THE BENEFIT OF STANLEY
S. TOLLMAN OR BRETT G. TOLLMAN,

      Defendants in rem.

VERIFIED COMPLAINT

08 Civ.

Plaintiff United States of America, by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, for its Complaint alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1.     This action is brought by the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) and 984, seeking the forfeiture of all right, title, and interest in the following property:

     a.     Any and all shares of stock and any other interest in BRYANSTON GROUP, INC. held in the name or for the benefit of Beatrice N. Tollman or Stanley S. Tollman;

     b.     Any and all shares of stock and any other interest in T.H. COURT CORP. held in the name or for the benefit of Stanley S. Tollman; and

     c.     Any and all partnership interest and any other interest in T.H. COURT LIMITED LIABILITY PARTNERSHIP held in the name or for the benefit of Stanley S. Tollman or Brett G. Tollman,

(collectively referred to hereinafter as the "Defendants in Rem").

2.     At the time of the filing of this Complaint, Bryanston Group, Inc. ("Bryanston") is a Georgia C-corporation owned 50% by the United States of America pursuant to a Final Order of Forfeiture filed on April 13, 2005 in the case of *United States v. Monty Hundley*, S3 02 Cr. 441 (LAP), in the United States District Court for the Southern District of New York, forfeiting to the United States of America all right, title and interest of Monty D. Hundley in Bryanston; and 50% in the name of Beatrice N. Tollman, who

received her interest in or about 1995 by means of a transfer, without consideration, of the 50% ownership interest held by Stanley S. Tollman.

3.     At the time of the filing of this Complaint, T.H. COURT CORP. is a Florida C-corporation owned by Stanley S. Tollman and Monty D. Hundley in equal shares. Hundley's interest is subject to an Amended Order of Forfeiture of Substitute Assets filed on or about February 5, 2008 in the case of *United States v. Monty Hundley and Sanford Freedman*, S3 02 Cr. 441 (LAP), in the United States District Court for the Southern District of New York.

4.     At the time of the filing of this Complaint, T.H. COURT LIMITED LIABILITY PARTNERSHIP ("T.H.COURT LLP") is a Florida limited liability partnership owned by Monty D. Hundley (47.125%), Stanley S. Tollman (1%), Sanford Freedman (4.75%), Brett Tollman (46.125%), and T.H. Court Corp. (1%). (Between in or about 1992 and in or about 1996, Stanley S. Tollman transferred 36.125% of his 37.125% interest in T.H. COURT LLP to his son, Brett Tollman, for no consideration.) Hundley's and Freedman's interests are subject to an Amended Order of Forfeiture of Substitute Assets filed on or about February 5, 2008 in the case of *United States v. Monty Hundley and Sanford Freedman*, S3 02 Cr. 441 (LAP), in the United States District Court for the Southern District of New York.

5.     Forfeiture is sought on the grounds that the Defendants in Rem constitute or are derived from proceeds traceable to mail fraud, wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1341, 1343 and 1344, and constitute property involved in money laundering

transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and conspiracies to commit such offenses, and property traceable to such property.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

7.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York.

## II. **PROBABLE CAUSE FOR FORFEITURE**

### BACKGROUND

8.      In the 1980's, Stanley S. Tollman and Monty D. Hundley built a hotel empire consisting of Days Inn of America, the franchisor parent of the budget hotel franchise, and more than one hundred individual hotels. Tollman and Hundley each made huge amounts of money from this venture. By the late 1980's, each estimated that his net worth exceeded $100 million. Tollman and Hundley financed their hotel empire by borrowing hundreds of millions of dollars from various banks and other financial institutions. Tollman and Hundley typically borrowed the money through limited liability entities, but gave their bank and other creditors personal guarantees of repayment in the event their entities were unable to do so.

9.      In the early 1990's, the hotel industry experienced a significant downturn, leaving many of the Tollman and Hundley properties unable to meet their debt service obligations. A voluntary restructuring of debt in the early 1990's resulted in Tollman and Hundley signing several personal promissory notes — called "deficiency notes" — obligating

4

them personally to pay creditors (including, among others, Marine Midland Bank, Chemical Bank, First National Bank of Chicago, National Westminster Bank, and Wells Fargo) more than $100 million, beginning in or about early June 1993.

10.    In the early 1990's, Tollman and Hundley also received an enormous financial windfall — they struck a business deal with Hospitality Franchise Systems ("HFS," now known as Cendant Corporation) that netted them together more than $100 million between mid-1993 and 1995. In the deal (hereinafter "the earn-out agreement"), HFS obtained from Tollman and Hundley the key assets of Days Inn of America. In exchange, Tollman and Hundley received, among other things, the right to receive a specified amount of stock in HFS over time if Tollman and Hundley's Days Inn franchises met certain financial targets. As a result of meeting those targets between early 1993 and mid-1995, Tollman and Hundley received under the deal, and then sold, more than $100 million in HFS stock.

11.    Tollman and Hundley took steps to hide and disguise their receipt and sale of the proceeds of the sale of the HFS stock. In particular, on May 26, 1993 — a day before Tollman-Hundley general counsel Sanford Freedman was notified in writing that Tollman and Hundley had earned the right to receive a 500,000 share block of HFS stock — Hundley and Tollman modified their earn-out agreement with HFS by assigning their rights to receive the HFS stock in their individual capacities to Bryanston. At that time, Bryanston was owned by Hundley and Tollman, each of whom held at least 45% of the shares, with the remaining shares owned equally by Freedman and Tollman's son, Brett Tollman. Moreover, when HFS

informed Freedman in writing on May 27, 1993, that Tollman and Hundley (through their assignee, Bryanston) had earned the right to receive the 500,000 HFS shares pursuant to the earn-out agreement, Freedman coordinated, between May and early July 1993, Tollman and Hundley's receipt of those shares and their immediate sale to the public through underwriters. The sale of the first group of shares yielded more than $15,000,000 to Tollman and Hundley, which was deposited into a Bryanston Group bank account in New York, New York on or about July 7, 1993. Tollman and Hundley received and sold the following number of HFS shares on the dates indicated, yielding the following proceeds that were deposited into Bryanston's New York-based bank account:

| DATE | NUMBER OF HFS SHARES SOLD | PROCEEDS TO BRYANSTON |
|---|---|---|
| 02/10/94 | 500,000 | $29,375,000 |
| 04/11/95 | 750,000 | $23,343,750 |
| 09/22/95 | 786,000 | $39,201,750 |

## THE FRAUD SCHEME

12.    As a result of their receipt of the HFS windfall between 1993 and 1995, Tollman and Hundley had the means to repay, in full, the deficiency notes they had given to their creditors in the early 1990's restructuring. Instead of repaying their creditors, Tollman and Hundley concocted a plan to carry out a massive bank fraud scheme that would allow them not only to spend the proceeds of the HFS deal as they wished, but also to make their personal bank debts disappear.

6

13.     Tollman and Hundley's first payments on the $100 million in personal debts under the restructuring plan were due on June 1, 1993, by which time Tollman, Hundley, and their co-schemers knew that Tollman and Hundley would be receiving the first multimillion dollar block of HFS shares.  In May 1993, Tollman, Hundley, and their senior employees began approaching the Tollman and Hundley creditors with a proposal. They explained that Tollman and Hundley were broke and unable to make the payments required under the restructuring plan.  They further claimed that Tollman and Hundley had been contacted by a group of European investors — operating through entities named Paternoster 2d Holdings Inc. ("Paternoster") and Chelsea Acquisitions Inc. ("Chelsea") — that were interested in doing business with Tollman and Hundley in the future.  As part of this plan, the co-schemers claimed that the  European investor group was prepared to purchase from the creditors Tollman and Hundley's outstanding deficiency notes and certain other debts, but because Tollman and Hundley were broke, the investor group was prepared to offer the creditors only pennies on the dollar.

14.     In truth and fact, as Tollman, Hundley, and their co-schemers knew, the European investors did not exist.  Instead, Paternoster and Chelsea were puppet companies, controlled by Tollman, Hundley, and certain of their employees, and funded with Tollman and Hundley's HFS windfall.  To give Paternoster and Chelsea the patina of legitimacy, employees of Tollman and Hundley arranged for certain relatives of Stanley Tollman (who did not share the Tollman name) to be listed, and thereafter to pose, as officers of Paternoster

and Chelsea, and to sign documents on behalf of those companies. Thereafter Tollman, Hundley and certain employees also arranged for a corrupt New York businessman, James Cohen, to pose as the representative of Paternoster and Chelsea and negotiate with creditors on their behalf.

15. To hide their connection to Paternoster and Chelsea and to further the fraud scheme, Tollman, Hundley, their employees and others acting at their behest disguised the source of the funds Tollman and Hundley used to finance Paternoster and Chelsea's debt purchase through a variety of stealthy and corrupt means, including (i) causing those funds to be funneled from Bryanston, via wire transfers involving bank accounts in the Southern District of New York, through the escrow account of an outside law firm, and (ii) directing funds owned by Tollman and his wife, which they maintained in a bank account in the Channel Islands, to be wire-transferred to Paternoster's bank account in the Southern District of New York.

16. Even though Tollman, Hundley, and their co-schemers knew that Tollman and Hundley had received, between mid-1993 and 1995, the proceeds of their HFS share sales, Tollman, Hundley, and their co-schemers took a variety of steadily escalating steps to convince the Tollman and Hundley creditors to believe that Tollman and Hundley were incapable of paying their debts. Initial statements by Hundley and certain employees of Tollman and Hundley about the inability of Tollman and Hundley to pay their debts were met by requests by creditors for detailed information about Tollman and Hundley's financial

condition. In response, Tollman, Hundley, and their employees would generally stonewall.

Creditors who persisted were inundated with essentially indecipherable or useless financial

information about the performance of individual Tollman-Hundley properties. Those

creditors who demanded more were provided letters from Tollman and Hundley's chief

financial officer purporting to provide the "latest information" about Tollman and Hundley's

financial condition. These letters, and accompanying oral statements, falsely depicted

Tollman and Hundley as essentially penniless, and failed to disclose their significant assets,

most notably the HFS stock windfall; their multimillion dollar interests in Bryanston, in

which they stashed proceeds of that windfall and Bryanston BP, a Florida corporation that

is a wholly owned subsidiary of Bryanston; their interest in Alpha Hospitality, a river boat

casino business they were developing in Mississippi, which they also funded with that

windfall; and their interest in T.H. Court Corporation, the Florida corporation that Tollman

and Hundley owned in equal shares, and which in turned owned T.H. Court LLP, the owner

of the Chesterfield Hotel, a luxury hotel in Palm Beach, Florida. When one creditor, Bank

of America, demanded even more information, requiring Tollman and Hundley to fill out a

lengthy questionnaire about their personal financial condition, Tollman and Hundley initially

stonewalled, and then depicted themselves as essentially broke.

17.    Over the course of the multi-year conspiracy, Tollman, Hundley, and their co-

schemers thus succeeded in fooling the Tollman and Hundley creditors into believing two

big lies: (1) that Tollman and Hundley were broke, when in fact they had reaped more than

$100 million from the HFS deal; and (2) that Paternoster and Chelsea represented a real, independent, European investment group, when no such group existed. Fooled by these misrepresentations, between 1993 and 1998, creditors sold more than $100 million in Tollman and Hundley debts to puppet companies Paternoster and Chelsea, for approximately $10 million, effectively cancelling more than $90 million in Tollman and Hundley debts. In addition, creditors agreed to forgive more than $13 million in debts owed by Tollman-Hundley entities and personally guaranteed by Tollman and Hundley. The bank fraud scheme allowed Tollman and Hundley to accumulate wealth and to hide assets from their creditors — assets that, but for the frauds, would have gone to the creditors.

### THE USE OF BRYANSTON IN THE FRAUD ON CHEMICAL BANK

18.    Chemical Bank held approximately $21,000,000 in Tollman and Hundley deficiency notes. To defraud Chemical in connection with the notes, Tollman and Hundley caused James Cohen to be introduced to representatives of Chemical Bank, who were seeking financial information from Tollman and Hundley and who had demanded to meet a representative of the foreign investors interested in purchasing Tollman-Hundley debt. Freedman falsely identified Cohen to Chemical as a representative of "investors that were interested in purchasing the Tollman-Hundley debt" from Chemical. During the meeting with Chemical, Cohen falsely represented that the fictitious foreign group was interested in doing business with Tollman and Hundley in the future.

19.    During the course of the dealings with Chemical, in 1994, Hundley falsely represented to Chemical that his interest in the earn-out arrangement with HFS had been transferred in trust to Hundley's children, leaving Hundley no access to those funds. In truth and fact, Hundley was a 50% owner of Bryanston in 1994, while the Chemical discussions were going on; in was not until 1995 — a year after the consummation of the Chemical fraud — that Hundley executed a *revocable* trust into which he transferred his 50% interest in Bryanston (at around the same time in 1995, Stanley Tollman transferred his 50% interest in Bryanston to his wife, Beatrice Tollman, without consideration). Moreover, in February 1994, just days after Bryanston received over $29,000,000 from the sale of HFS shares, Tollman, Hundley and their employees caused the transfer of millions of those funds to allow Paternoster to purchase the Tollman and Hundley deficiency notes from Marine Midland, Dunden (James Cohen's company, which was employed initially to purchase the First Chicago note, later resold to Paternoster), and NatWest.

20.    After Chemical was deceived into believing that Tollman and Hundley lacked the wherewithal to pay their debts and that an independent foreign investor group had agreed to buy those debts at a steep discount, Freedman caused the incorporation of a new sham entity, Chelsea Acquisitions, which would be the vehicle by which the purported European investor group would effectuate the purchase of the Tollman-Hundley indebtedness from Chemical.

21.    This new entity was created in order to cover for a fraudulent ad-lib by Hundley to Chemical regarding the identities of the fictional European investors. Before the introduction of Cohen to Chemical, the Chemical bankers had requested the names of the investors who were allegedly seeking to purchase the Tollman-Hundley debt. In a meeting attended by Hundley, Freedman and representatives of Chemical, Hundley falsely represented that one of the investors was Kenneth Bates, Stanley Tollman's London-based associate and former business partner, and then the owner of the London-based Chelsea soccer club, and another was an unnamed Greek investor whose purported picture Hundley displayed at the meeting. To maintain consistency with Hundley's story, Tollman and Hundley had Freedman create Chelsea.

22.    Freedman directed Tollman-Hundley's outside counsel to incorporate Chelsea. Freedman advised them that Chelsea's stockholders were Arnold Tollman (Stanley Tollman's brother), who held a 90% interest, and Kenneth Bates, who held a 10% interest. Freedman made himself and Michael Ness (another business associate of Stanley Tollman, who was based in Bermuda) officers of Chelsea. Freedman prepared, sent to Ness, and caused Ness to sign a document falsely representing that Kenneth Bates held an ownership interest in Chelsea.

23.    In May 1994, Tollman and Hundley signed and caused to be sent to Chemical documents falsely representing that neither Stanley Tollman nor Monty Hundley had a legal or beneficial ownership interest, directly or indirectly, in Chelsea. In truth and fact, Tollman

and Hundley had interests in Chelsea, and their money (transferred from Bryanston) were used to purchase the Tollman and Hundley indebtedness held by Chemical. That same month, in order to disguise Bryanston as the source of the funds, the wire transfer for the purchase of the Chemical debt was routed from a Bryanston bank account to an escrow account of the outside lawyers and then to Chemical.

## THE FRAUD ON BANK OF AMERICA

24.     In or about December 1992, Tollman and Hundley executed a promissory note in the amount of $12,182,375.25 payable to Bank of America. The note, which stemmed from hotel-related indebtedness incurred by Tollman and Hundley with Security Pacific Bank (a predecessor to Bank of America) provided that, in the event of a failure to pay the promissory note, Tollman and Hundley were personally liable for $9,136,781.44, the recourse portion of the note.

25.     In or about May 1993, in an effort to convince Bank of America to sell the promissory note for less than the full amount, Hundley wrote to an official of the bank and falsely represented that he and others had had discussions with a "European group" interested in purchasing the promissory note from Bank of America for $1,250,000. Bank of America rejected Hundley's offer at that time. On or about November 22, 1994, in response to a request from Bank of America for a status report relating to the Tollman and Hundley debt, the chief financial officer for Tollman and Hundley's companies sent a letter and schedule of debt to Bank of America. In that letter, the chief financial officer falsely represented that

many of the Tollman and Hundley notes had been sold to "unrelated" third parties. In truth and fact, the notes had been sold to Paternoster and Chelsea, which were controlled by Tollman, Hundley, and their corporate employees.

26.    In or about June and August 1995, co-schemer James Cohen telephoned a representative of Bank of America and falsely represented that his investment group was interested in purchasing the Tollman and Hundley promissory note from Bank of America. On or about August 29, 1995, a representative of Bank of America sent to Cohen a form affidavit of financial condition and cover letter indicating that Tollman and Hundley would be required to complete the affidavit if they wished to pay less than the full amount owing on the promissory note. In or about January 1996, an attorney for Bank of America sent to an attorney for Tollman and Hundley a form financial statement that Bank of America was requiring Tollman and Hundley to fill out.

27.    On or about June 19, 1996, Hundley sent a letter and various financial statements and schedules to a representative of Bank of America. In the letter, Hundley falsely represented that the group represented by James Cohen, which Hundley claimed was an unsecured creditor of Tollman and Hundley's, would record confessions of judgment against Tollman and Hundley before Bank of America could record its own judgment against them. Hundley also claimed that (i) he and others had persuaded Cohen's group to keep open its offer to pay $850,000 for the Bank of America debt, and (i) he and Tollman had "solicited friends and family" and had raised $200,000 that could also be used to pay Bank of America

14

in a settlement. In the financial statement and schedules, Hundley falsely represented that the total value of his assets was $58,201 and that the total value of Tollman's assets was $36,650.

28.    At the time of the submission of the financial statement and schedules, assets owned or controlled by Tollman, directly or indirectly, but not identified on his financial statement and schedules included a home in Palm Beach, Florida worth more than $4,000,000; a residence in New York, New York comprising the whole eleventh floor of 485 Park Avenue, worth more than $3,500,000; a farm in New Preston, Connecticut worth more than $4,000,000; a flat in London, England worth more than $2,000,000; a fleet of luxury automobiles, including Rolls Royces, Bentleys, and an Aston Martin; an ownership interest in The Travel Corporation, the holding company that owned the international travel and tourism company Trafalgar Tours International; thousands of shares of stock in Alpha Hospitality; and ownership interests in Bryanston. Assets owned or controlled by Hundley, directly or indirectly, but not identified in his financial statement and schedules, included an estate in Bedford, New York worth more than $5,000,000; thousands of shares of Alpha Hospitality stock; and ownership interests in Bryanston.

29.    On or about July 1, 1996, in an interstate telephone conversation, a representative of Bank of America repeated to Hundley that the bank would require Hundley and Tollman to provide affidavits of financial condition on the forms supplied by Bank of America. On or about July 12, 1996, Hundley sent to a Bank of America representative a

15

letter together with reconciliations of his and Tollman's 1990 financial statements to their current purported financial conditions. The reconciliations Hundley sent to Bank of America falsely represented the financial condition of Tollman and Hundley as of July 1996 – for example, by failing to disclose valuable assets held by Tollman and Hundley. On or about July 30, 1996, Hundley sent a package by Federal Express in New York to a representative of Bank of America in Los Angeles containing a projected monthly income and expense schedule for himself, together with an affidavit of financial condition for Tollman. In the schedule, Hundley falsely represented his income. In the affidavit, Tollman made a number of false representations relating to his income, assets, and prior transfers of his property.

30.    In or about August 1996, as a result of the financial and other representations made by Tollman, Hundley, and others to Bank of America, a representative of Bank of America recommended that the bank accept the offer to purchase Bank of America's judgment for approximately $1,310,000. Thereafter, Tollman, Hundley, and other co-schemers caused Bank of America to be informed that Paternoster would be the entity that would purchase the Bank of America judgment. As a condition of the sale of its judgment and promissory note to Paternoster, Bank of America thereafter demanded that Tollman and Hundley represent and warrant in writing that (i) neither Tollman nor Hundley was paying all or a portion of the purchase price that Paternoster was paying for the judgment and note; (ii) neither Tollman nor Hundley was contributing funds or other property to Paternoster to fund Paternoster's payment; and (iii) neither Tollman nor Hundley had any financial or

ownership interest in Paternoster. On or about November 1, 1996, Tollman and Hundley both signed an agreement with Bank of America containing the foregoing representations and warranties. These representations and warranties were false because, as Tollman and Hundley well knew, the funds being used to purchase the Bank of America judgment were being supplied by Tollman, and both Tollman and Hundley had financial interests in Paternoster.

31.     On or about November 1, 1996, Freedman caused Tollman's then son-in-law to sign, on behalf of Paternoster, the agreement pursuant to which Paternoster purchased Bank of America's judgment and note.

32.     From in or about late October 1996 to on or about November 8, 1996, Tollman caused $1,280,000 to be wire transferred from a bank account he controlled under the name "Client's Account X" at Royal Bank of Canada in Guernsey, in the Channel Islands, to Paternoster's account at Republic National Bank in the Southern District of New York. Tollman's wife, Beatrice Tollman, requested a representative of a Guernsey accounting firm who oversaw the Client Account X for Tollman, his wife, and his relatives, to disguise the transfer by making it appear to be a loan from the accounting firm to Paternoster. In truth and fact, the money had come from a series of accounts controlled by Tollman, his wife, and other family members and used to pay their personal obligations. Tollman's secretary and his wife, Beatrice, made international telephone calls to determine that the Tollman funds were sent from the Channel Islands to Paternoster's bank account in New York. On or about

November 8, 1996, Tollman's then son-in-law caused Paternoster to wire transfer $1,278,906 from its account in New York, New York to Bank of America in Los Angeles, completing the payment for the note and judgment held by Bank of America.

## TOLLMAN AND HUNDLEY ENRICH THEMSELVES WITH THE MONEY CONCEALED FROM CREDITORS

33.    The assignment of the earn-out proceeds to Bryanston furthered the fraud scheme and served to personally enrich Tollman, Hundley, their families and associates by millions of dollars. Tollman and Hundley used the proceeds of the offenses — funds that, but for the frauds, would have been available to pay the bank debts — to retain, purchase, and increase the value of, various assets.

34.    For example, Tollman and Hundley failed to disclose to their creditors their interest in T.H. Court Corp., the Florida corporation owned by Tollman and Hundley in equal shares, which was and is the general partner of T.H. Court LLP, the owner of the Chesterfield Hotel in Palm Beach, Florida. Shortly after receiving HFS payments in 1993, Tollman and Hundley caused the incorporation of Bryanston BP, which thereafter purchased from Barclays Bank the multimillion dollar mortgage on the Chesterfield.

35.    In addition, during the course and in furtherance of the scheme, Tollman and Hundley transferred some of their assets, for no consideration, for the purpose of concealing them from creditors. For example, Stanley Tollman transferred his 50% interest in Bryanston to his wife, Beatrice Tollman, and virtually all of his approximately 35% interest in T.H.

Court LLP to his son, Brett Tollman. Through these fraudulent transfers, Tollman concealed and protected from creditors his substantial interest in, and control of, the Chesterfield Hotel.

### III. CLAIM FOR FORFEITURE

36.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation contained in paragraphs one through thirty-one of this Verified Complaint.

37.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

38.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

39.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that they constitute or are derived from proceeds traceable to offenses constituting specified unlawful activity, to wit, violations of 18 U.S.C. § 1344 (relating to financial institution fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud); and property traceable to such property.

40.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of

this title [relating to money laundering], or any property traceable to such property," is subject to forfeiture to the United States.

41.    18 U.S.C. § 1956(a)(1), commonly known as the money laundering statute, imposes a criminal penalty upon any person who,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

> (A)    (i) with the intent to promote the carrying on of specified unlawful activity; or

> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

> (B)    knowing that the transaction is designed in whole or in part–

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

> (ii) to avoid a transaction reporting requirement under State or Federal Law.

42.    Section 1956(a) further imposes a criminal penalty upon any person who:

(2) ... transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form

of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part–

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

> (ii) to avoid a transaction reporting requirement under State or Federal law.

43.    Section 1956(f) provides that:

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if--

> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

44.    Section 1956(h) provides that:

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

45.    Section 1957 of Title 18, United States Code, provides, in pertinent part, that "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a crime. A "monetary transaction" includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution ..." 18 U.S.C. § 1957(f)(1).

46.    By reason of the foregoing, the Defendants in Rem became and are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A), and 984.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants in Rem and that all persons having an interest in the Defendants in Rem be required to appear and show cause why the forfeiture of the Defendants in Rem should not be decreed, that this Court decree forfeiture of the Defendants in Rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as it may deem just and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
       May 22, 2008

> MICHAEL J. GARCIA
> United States Attorney for the
> Southern District of New York
> Attorney for the Plaintiff
> United States of America

By: _____
      STANLEY J. OKULA
      BARBARA A. WARD

## **VERIFICATION**

STATE OF NEW YORK                )
COUNTY OF NEW YORK               :
SOUTHERN DISTRICT OF NEW YORK  )

CHRISTINE MAZZELLA, being duly sworn, deposes and says that she is a Special Agent of the Internal Revenue Service, Criminal Investigation, and as such has responsibility for the within action; that she has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of her own knowledge, information, and belief.

The sources of deponent's information and the ground of her belief are official records and files of the United States and information obtained directly and indirectly by deponent during an investigation of alleged violations of Title 18, United States Code.

*Christine Mazzella*

CHRISTINE MAZZELLA
Special Agent
Internal Revenue Service

Sworn to before me this
22nd day of May, 2008

NOTARY PUBLIC

JEANETTE ANN GRAVER
Notary Public, State of New York
No. 01GR4995793
Qualified in Kings County
Commission Expires Nov 30, 2009