UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  -against-<br><br>ALL RIGHT, TITLE, AND INTEREST IN:<br><br>ANY AND ALL SHARES OF STOCK AND ANY OTHER INTEREST IN BRYANSTON GROUP, INC. HELD IN THE NAME OR FOR THE BENEFIT OF BEATRICE N. TOLLMAN OR STANLEY S. TOLLMAN;<br><br>ANY AND ALL SHARES OF STOCK AND ANY OTHER INTEREST IN T.H. COURT CORP. HELD IN THE NAME OR FOR THE BENEFIT OF STANLEY S. TOLLMAN; and<br><br>ANY AND ALL PARTNERSHIP INTEREST AND ANY OTHER INTEREST IN T.H. COURT LIMITED LIABILITY PARTNERSHIP HELD IN THE NAME OR FOR THE BENEFIT OF STANLEY S. TOLLMAN OR BRETT G. TOLLMAN,<br><br>       Defendants in rem. | DECLARATION OF ASSISTANT U.S. ATTORNEY STANLEY J. OKULA, JR.<br><br>08 Civ. 4806 (LAP) |

STANLEY J. OKULA, JR., hereby declares under penalty of perjury:

1.      I am an Assistant United States Attorney in the Office of Michael J. Garcia, United States Attorney for the Southern District of New York. I am the attorney principally responsible for the prosecution of Monty Hundley, Stanley Stephen Tollman and Beatrice Nina Tollman, including the extradition proceedings in the United Kingdom with respect to the Tollmans. I respectfully provide this declaration in connection with the Motion of the

United States to Strike the Claims filed by Stanley and Beatrice Tollman, and an accompanying Memorandum of Law.

2.      The aforementioned Memorandum Of Law sets forth various facts relating to, among other things, the extradition proceedings with respect to Stanley S. Tollman and Beatrice Nina Tollman and Stanley S. Tollman's refusal to surrender on the charges pending before this Court.

3.      Based on my knowledge of the aforementioned matters, and the documents relating to those matters, I hereby declare that the facts set for in the Government's Memorandum Of Law are true and accurate.   Attached to this Declaration as Exhibit A is a true copy of the decision by the United Kingdom Magistrate who presided over the extradition proceedings relating to Stanley S. Tollman and Beatrice Nina Tollman.   Also attached, as Exhibit B, is a witness statement given by me in that proceeding.   I hereby declare that the facts set forth in that witness statement are true and accurate.

Dated:      New York, New York
            August 11, 2008


                                    STANLEY J. OKULA, JR.
                                    Assistant U.S. Attorney

# EXHIBIT A

IN THE CITY OF WESTMINSTER MAGISTRATES' COURT:

UNITED STATES OF AMERICA

-v -

STANLEY TOLLMAN

1. In these extradition proceedings the Government of the United States of
   America seeks the extradition of Stanley Tollman in respect of certain
   offences of fraud.

2. The case has had a long and varied history but by virtue of a judgement
   of the High Court of Justice, Queens Bench Division, Administrative
   Court dated the 7th February, the matter has been returned to me to
   consider whether extradition is barred under Section 82 of the
   Extradition Act 2003 on the sole basis that, by reason of the passage of
   time, it would be oppressive to Mr Tollman because his wife's health
   might be endangered.

3. To enable this short point to be considered I gave directions that the
   defence should serve all relevant evidence by the 14th March and the
   prosecution were to serve all evidence on which they intended to rely by
   Thursday 20th March. In response to that direction the defence served
   evidence of the defendant's two daughters, Victoria Tollman-O'Hana and
   Antoinette Tollman and both these ladies gave evidence before me. No

1

evidence was served by the prosecution by the 20th March but on 26th March, the day before the hearing, the Government served a letter dated 25th March 2008 from the United States Department of Justice signed by the Prosecuting Attorneys for the Southern District of New York.

4.  I have permitted the letter of the 25th March 2008 to be introduced in these proceedings and will deal with the issues that are raised in relation to the proposals of the Department of Justice. The issue, however, does arise in a rather curious way in that, at the hearing before the Administrative Court in November 2007, Lord Justice Moses observed

> "if she separated from her husband after these 53 years when she is so ill, it would be very bad for her health, then that seems to be to be possibly to be cured by the fact that if she went back so that she was in the United States he could be seeing her and she would be confident that he was around even though he was being tried for these very serious offences".

5.  Mr Jones on behalf of the Government responded by saying that "the Americans regard, in American law, both persons as fugitives with whom they will not entertain any discussion about the sort of matter your

6.  That issue was referred to in the High Court's Judgement of the 7th
    February 2008 in which it was said:-

    " We should also comment that were the United States Government
    to agree not to prosecute Mrs Tollman, particularly in light of her ill
    health and the fact that we have not disturbed the Senior District
    Judges' refusal to extradite Mr Tollman in relation to those matters
    with which his wife is charged, she could return to the United States
    and be cared for there during the period of Mr Tollman's return
    and during his trial".

7.  In the light of these observations it is surprising that this issue was left
    until the day before this hearing thereby requiring the defence to bring
    expert evidence from New York on a few hours notice.

8.  The issue raised by the letter is whether the offer made by the
    Department of Justice is one which Mrs Tollman could reasonably accept
    and if she did so whether it would reduce the level of oppression suffered
    by her by virtue of her illness and, through her, to her husband.

9.  The proposal from the Department of Justice is that in the event that Mr
    Tollman is returned to the United States, the Department of Justice did
    not intend to seek pre-trial detention but would be intending to seek an
    order from the court containing stringent conditions of bail including the
    home detention of Mr Tollman with electronic monitoring.

3

10. In respect of Mrs Tollman, if she were to return to the United States, the United States "would vacate and not seek to enforce the outstanding Arrest Warrant and would not issue any other compulsory process with respect to the charges, against her, or otherwise require her to appear in connection with such charges for as long as she remained in the United States during pendency of any pre-trial, trial, post trial and post conviction proceedings with respect to her husband Stanley Tollman".

11. Mr Fitzgerald QC on behalf of Mr Tollman submits that the proposals do not provide sufficient legal safeguards to her and they do not provide the circumstances necessary to relieve the acute medical symptoms from which she is suffering.

12. In the few hours available to them, the defence arranged for the attendance of Dr Pierides to give evidence about the proposals and for Mr James Bruton, a New York Attorney, to fly overnight to give evidence.

13. Mr Bruton, a member of the New York Bar and a former United States Attorney gave evidence to me of what he, in his expert opinion, considered to be the effect of the letter. He noted that the United States Attorney for the Southern District of New York "does not intent to seek detention" of Mr Tollman and pointed out that "an intention" can be changed and that the letter could not be considered to be a binding, enforceable commitment. He acknowledged that the view of the United

4

States Attorney would carry considerable weight with the District Court; but it was nevertheless the District Court's decision as to whether bail should be granted and the prosecutor could not bind the court.

14. He did not doubt the competence of Mr Okula, the assistant United States Attorney but pointed out that no United States Attorney can bind another United States Attorney and that the assurances offered would not be binding even in the neighbouring districts of New York. It would certainly not be binding on courts in other Federal Courts.

15. Mr Bruton told me that the letter did not provide immunity from prosecution and he would expect any such immunity to come from considerably higher United States Government officials, probably from the Attorney General himself. In the absence of any enforceable binding commitment providing immunity from prosecution he could not advise Mrs Tollman to return to the United States.

16. Dr Pierides saw Mrs Tollman ~~yesterday~~ on the 26th March shortly after she has been told of the proposal by the United States Prosecutor. In his evidence in May 2007, Dr Pierides told me that Mrs Tollman was suffering from serious physical and mental ill health which was probably not reversible. In the event of Mr Tollman being sent to America there would be an inevitable and disastrous affect upon her health. Since that time he has been seeing her regularly every 3 or 4 weeks but when he saw her on the 26th March he noted Mrs Tollman's mental state had

5

07/04 2008 10:55 FAX  +44 20 7400 6464      3 RAYMOND BUILDINGS

deteriorated remarkably and he told me "I can unequivocally say that a
return, even if she were to agree to such a return, would have a
devastating affect upon her mental health and is out of the question". He
told me that being deprived of her husbands care and of the care of her
psychiatric team she was unlikely to survive. She was a risk to herself
and he could not advise her to travel.

17. I found the evidence of Mr Bruton and the evidence of Dr Pierides to be
entirely reliable and convincing. Both were experts in their fields and
their evidence was largely unchallenged. I find as a fact that Mr Bruton
has grounds for advising Mrs Tollman not to return to the United States
of America and, if she were able to fully understand the implications, I
think it is highly unlikely that she would disregard that advice.

18. Dr Pierides is unequivocal in his view that it would be highly dangerous
and life threatening to expect Mrs Tollman to travel to the United States
of America, not least because she would have to change the psychiatric
team which had been treating her so intensively over many months.
Based upon the medical and legal advice being tendered to Mrs Tollman I
conclude that it is highly unlikely that she would be willing or able to
travel to the United States and that such a decision would be entirely
reasonable given the advice that has been tendered.

6

19. I heard evidence from Mr and Mrs Tollman's two daughters, Victoria Tollman–O'Hana and Antoinette Tollman.   Their evidence was obviously given from the perspective of two daughters who were concerned for their parents and were anxious to do whatever they could to assist them.  Nevertheless I found their evidence to be truthful and persuasive.  They both described the deterioration that they had seen in their mothers health both mentally and physically particularly, over the last eighteen months.

20. Victoria Tollman-O'Hana told me that she resides in Geneva with her three daughters and is therefore unable to offer as much care for her parents as she would like.  However, she told me that her mother's dependency on her father was such that he was assuming more and more responsibility for her as she was struggling to make the smallest decisions for herself.  She told me that when her father was not at home her mother waited anxiously for him to return becoming agitated in his absence.  Her father was only able to leave his wife for occasional short periods of a few hours.  In her view it was only her father who managed to get through to her to comfort her and to calm her nerves.

21. Antoinette Tollman told me that she visits her mother almost every day and had been shocked to observe the changes in her physically and mentally.  Whilst she assists in looking after her mother, she told me that only her father was able to provide her mother with the care and emotional and physical support that she requires.  In her statement she

7

07/04 2008 10:55 FAX +44 20 7400 6464   3 RAYMOND BUILDINGS   ☑ 009/010

explained that her brother, Wynn was resident in South Africa and that
her other brother Brett, although resident in London, has only had
limited contact with his mother over many years and is not able to offer
any emotional support to her.

22. Both daughters gave evidence of what they believe to be a high risk of
suicide if their mother was separated from their father. They based that
evidence upon comments made by their mother and requests made to
Victoria Tollman-O'Hana to purchase large quantities of sleeping tablets.

23. Based upon the evidence of the two daughters and of Dr Pierides, I am
satisfied that there is a very high degree of care being provided by Mr
Tollman to his seriously ill wife. I am satisfied that the background to
this long marriage is such that only he can provide that care, there being
no other family members capable of meeting the need. In an extreme
position the danger of suicide might be averted by compulsory admission
to hospital.

24. It is accepted that in this case there has been a significant passage of time
since the extradition offences were alleged to have been committed. The
High Court have concluded that there will be no injustice in returning
Mr Tollman to the United States of America and the sole issue, which has
been returned to me, is whether there will be oppression to Mr Tollman if
Mrs Tollman's health was endangered were he to be extradited to the
United States of America.

8

25. I have concluded that the arrangements proposed by the Prosecuting Attorney for New York are not open to Mrs Tollman by virtue of the gravity of her illness and because of the legal advice she has been offered as to the risk of future prosecution.

26. I have considered whether there are any alternative arrangements for caring for Mrs Tollman in the event of her husband being extradited. I have concluded that the threat to her health and to her life is a real one and that Mr Tollman's extradition would severely exacerbate her condition. I have considered again the case of Cookeson and again reached the conclusion that this case cannot be distinguished. Extradition would inevitably cause oppression to Mrs Tollman. Mr Tollman is currently her sole carer undertaking this task after some 54 years of marriage. He is aware of the suffering his wife would experience, possibly involving the loss of her life, should he be extradited. I am satisfied that the oppression to Mrs Tollman can therefore pass through her to him on the principles enunciated in Cookeson.

27. I therefore conclude that the bar to extradition contained in Section 82 of the Extradition Act 2003 applies in this case in that it would now be oppressive to return Mr Tollman to the United States of America and the defendant is therefore discharged.

Tim Workman
Senior District Judge
City of Westminster Magistrates' Court
7th April 2008

9

# EXHIBIT B

IN THE CITY OF WESTMINSTER MAGISTRATES' COURT
Extradition hearing 26, 27 February and 1 March 2007

**Government of the United States of America**

v

**Stanley Stephen Tollman**

and

**Beatrice Nina Tollman**

**Witness Statement of Stanley J. Okula, Jr.**

1    I have given evidence in these proceedings previously. I respectfully submit this
supplementary evidence in connection with the request of the Government of the
United States to the United Kingdom seeking the extradition of Stanley S.
Tollman.  More particularly, I provide this sworn statement in order to assist the
City of Westminster Magistrates' Court in relation to the most recent arguments
tendered by Stanley Tollman seeking to block his extradition --- viz., that to
extradite him would be unjust or oppressive by reason of the passage of time. I
therefore respond to certain assertions made by Mr Tollman in the written defense
materials served in the last three weeks.

2    I deal in particular with the unsigned document, attached to a witness statement of
Professor Sara Sun Beale, called "Outline Defence Case Statement". This
document, although unsigned and unsworn, purports to contain the words of
Stanley Tollman.  Much of the evidence I give about it, below, is also directly
relevant to the evidence expected to be given by the witnesses noticed by Mr
Tollman, whose statements have been served in advance. I make some specific

1

comments on the evidence of Mr Patrusky by reason of his involvement in aspects of the investigations connected with this case.

<u>Stanley Tollman's knowledge of the investigation and his refusal to attend court in New York in 2002.</u>

3    In my affidavit of October 7th 2004, I gave evidence at paragraphs 107-108 of the circumstances in which Stanley Tollman failed to appear at court in New York on 24 April 2002. An explanation is offered at paragraphs 9 and 10 of the "Outline Defence Case Statement" as to why Mr Tollman did not surrender to the United States District Court in New York in April 2002.

4    This account is not accurate. The Court will be invited to conclude at the hearing at the City of Westminster Magistrates' Court that the reason why Stanley Tollman failed to attend court in New York, as agreed between me and the lawyers representing him at the time, was that he knew he faced many years' imprisonment.

5    At paragraph 9, Stanley Tollman states:
    "I now believe that the US Internal Revenue Service first began investigating Monty Hundley in August 1996, now over ten years ago. However, it was only six years later that an indictment was first issued against me, in 2002, and it became clear that I would be prosecuted"

6    It is necessary to deal with the history of the investigation in some detail, in order to correct the suggestion made by Mr Tollman --- through his use of the expression "I now believe" --- that he was unaware of the nature, scope, and many particulars of the IRS investigation for some years. The investigation culminating in the indictment of Mr Tollman was commenced in 1996 as an IRS "administrative" investigation. This type of investigation --- as opposed to an IRS "grand jury" investigation --- allows the investigating IRS agent to conduct his or her investigation through the issuance of summons (like subpoenas) and the

2

conducting of interviews. Witnesses interviewed during the investigation are permitted to have counsel represent them.

7  Following the completion of the IRS agent's investigation, the agent must write a detailed report, called a "Special Agent's Report ("SAR"), detailing all of the evidence that had been gathered and requesting authorization to seek criminal charges, through the local United States Attorney's Office, within the United States Department of Justice. Authorization to seek tax and tax-related charges must be obtained from the Tax Division of the United States Department of Justice ("DOJ Tax"), located in Washington, D.C.  It is the practice of the Tax Division to allow targets of IRS investigations --- as Mr. Tollman and his co-defendants were identified in or about late 1998 --- to present arguments, both written and oral, as to why tax and tax-related charges should not be authorized by DOJ Tax. In connection with this practice, the Tax Division meets with counsel and explains certain basics of the charges.

8  In the investigation of Hundley and Tollman, it is my understanding that Stanley Tollman retained a personal attorney very early in the IRS investigation, that is, some time in late 1996 or early 1997.  The attorney, John J. ("Jack") Tigue, was and is a prominent white collar criminal defense attorney at one of New York's pre-eminent white collar criminal defense firms, known as the "Morvillo Abramowitz" law firm. From records I have seen and discussions I have had with the lead IRS agent, it is my understanding that Mr. Tigue played a significant role in the defense of Mr. Tollman from the outset of the IRS investigation.

9  For instance, I have seen documents and reports from the IRS agent who conducted the investigation showing that Mr. Tigue and another attorney at the Morvillo Abramowitz firm represented not only Stanley Tollman during the early stages of the IRS investigation, but also, to a limited extent, Sanford Freedman, the general counsel of the Tollman-Hundley companies.  He was indicted with Mr. Tollman in 2002 and convicted at trial of the very same conspiracy charge

3

that Mr. Tollman is now claiming lacks evidentiary support. Mr. Freedman was interviewed by the IRS in February 1997, with Mr. Tigue and an associate from the Morvillo Abramowitz firm present.

10 During the course of that interview, Mr. Freedman was asked extensive questions about a topic that became the center-piece of certain allegations contained in the indictment: the role played by the sham entity Paternoster in the purchase of the Tollman-Hundley debt. More particularly, Freedman was asked various questions about: Arnold Tollman's role with Paternoster, the funding of Paternoster, and the role, if any, played by Stanley Tollman and his business partner, Monty Hundley, in the control and funding of Paternoster. Accordingly, as early as 1997, Stanley Tollman, through counsel, became aware of one of the critical focuses of the United States investigation. Also the subject of questioning during that early interview was the bank indebtedness purchased by Paternoster.

11 The extensive role played by Tollman's attorney in the early stages of the United States investigation was made manifest through the written presentations made by Tollman in attempting to convince DOJ Tax not to authorize prosecution of Tollman by the United States Attorney's Office for the Southern District of New York --- the Office for which I work. More particularly, Tollman's attorney (Tigue), armed with the information he had gathered and learned during his representation of Tollman between 1997 and early 1999, hired Jerome Kurtz, a former commissioner of the IRS and now (as well as in 1999), a professor at New York University Law School, to prepare a detailed, written analysis of whether Stanley Tollman could properly be charged with attempting to evade cancellation-of-debt income. Mr. Kurtz sent his written analysis to DoJ Tax on behalf of Stanley Tollman.

12 In addition to the Kurtz written document, Tigue prepared and sent to DOJ Tax, on behalf of Stanley Tollman, a detailed, written analysis of the history of many of the bank loans and debts that are at the heart of the indictment against Tollman.

4

In his eleven-page written submission, Tigue made clear that he had gathered and analyzed the documents underlying the bank debt that Tollman is claimed of fraudulently purchasing from the banks through Paternoster and Chelsea. This extensive involvement by Tigue in the early defense of Stanley Tollman indicates that Tollman, through his then-attorneys, had ample opportunity to --- and actually did --- investigate and examine many of the documentary facts underlying the criminal charges ultimately levelled against him. In the normal way, the product of this work would have been turned over to Stanley Tollman's present lawyers when they began to represent him shortly after the 2002 indictment, when the Morvillo Abramowitz lawyers withdrew from representing Tollman.

13   The IRS investigation from mid-1996 until early 1999, and the subsequent grand jury investigation between May 1999 until April 2002 (the latter being conducted by my Office), resulted in the production of thousands and thousands of records by the companies owned by Tollman and Hundley --- the TH Hotels Group. The companies --- which were represented during the United States investigation by an attorney, Charles Clayman, who enjoys a close professional and personal relationship with Tigue (and, indeed, was likely enlisted by Tigue to represent the companies), was free to keep exact copies of the documents supplied by them to the grand jury, and to distribute them to the lawyers acting for the suspects.

14   To my knowledge, most if not all of the copies of this documentary information are still in the Tollman-Hundley companies, and must be available to Stanley Tollman and his lawyers to this day. I cannot think of any substantial documentation relevant to the charges under discussion that is in the prosecution's possession and is not available to Stanley Tollman's lawyers either through document sharing with co-counsel during the investigation or through examination of the record of the trial of Tollman's co-conspirators, all of whom were convicted at trial of conspiring to defraud the banks.

15  Stanley Tollman's lawyers have also had access to the evidence given by a number of Tollman Hundley secretaries and other administrative employees, including company accountants. As noted above, it is my understanding that Mr Tigue enlisted Charles Clayman to represent the Tollman-Hundley companies during the course of the United States investigations. Clayman also represented many individual employees of the companies during the administrative and grand jury investigations.

16  As part of those representations, Clayman: attended interviews conducted by the IRS agent during the administrative investigation; attended interviews of many of the employees during the course of the United States Attorney's Office ("USAO") investigation; negotiated and secured agreements with the Department of Justice on behalf of those employees, which agreements generally provided that the employees would not be prosecuted provided they gave truthful and complete evidence; and accompanied many of the witnesses to their appearances before the grand jury, where he was available outside the grand jury room to consult with the witnesses after --- or even in the middle of --- their questioning.

17  These employees represented by Clayman included:

   a.  Peggy Young, executive secretary to Mr Hundley and Stanley Tollman; Alice Abalos (now Alice Burke), an administrative assistant who worked for Stanley and Beatrice Tollman for many years;
   b.  Rachel Davis, an administrative assistant for Beatrice Tollman who worked out of the Tollman residence at 485 Park Avenue and who, among other things, was responsible for preparing, for tax purposes, an annual record of all the days Stanley Tollman was in New York State or in some other state or country;
   c.  Danka Maricic, who succeeded Alice Abalos and performed the same duties;
   d.  Melissa "Mitzy" Keeley, an administrative employee who worked for Brett Tollman and others in the New York office of the Tollman-Hundley companies;
   e.  Jennifer Clifton, the professional London chef who worked for Mr and Mrs Tollman and travelled with them between New York, London, and Palm Beach, among other places;

6

    f.  Jodee Plemmons, a staff accountant who received unreported compensation while working at the Tollman-Hundley companies;

    g.  Joan Richardson, an administrative assistant for Beatrice Tollman who worked out of the Tollman residence at 485 Park Avenue;

    h.  Craig Kendziera, a supervisory accountant at the Tollman-Hundley companies; and

    i.  Robert Steenheuisen, an accountant at the Tollman-Hundley companies.

18  It was clear to me during the investigation that Mr Tigue and Mr Clayman worked co-operatively. The Tollman-Hundley companies paid Mr Clayman's fees, as well as the fees of many of the T-H witnesses represented by Clayman. It is open to any grand jury witness to report to anyone what he or she has given in evidence to the grand jury (although the transcripts are not disclosed to the witnesses during the investigation). I personally witnessed Mr. Clayman making notes of the facts given during the investigation not only during interviews but in connection with the grand jury appearances of those witnesses.

19  All the aforementioned witnesses, as well as the convicted defendants, are in a position to assist Mr Tollman on such questions as his movements in and out of New York, and to give evidence on his behalf as to his alleged habit of signing documents without reading them. So, too, are the various employees who lived at his New York apartment or visited it, including:

    a.  the doorman to the 485 Park Avenue property;

    b.  the numerous employees on the Connecticut compound;

    c.  the live-in staff at the Palm Beach property;

    d.  the domestic staff at the London home;

    e.  chauffeurs in New York;

    f.  the pilot of the private plane in which Mr Tollman and Mr. Hundley travelled (who kept logs of his travel); and

    g.  Mr Tollman's other brother (Ivan) and other son, the former of whom has worked for his companies at some time.

20  Two important developments in the investigation took place between late 2001 and April 2002, before, as I described at paragraph 107 of my affidavit of October 2004, the indictment was returned on April 17 2002. The first development was the receipt of documentary and other information from authorities in Guernsey,

whom we had requested to provide assistance in 2001. The first documentary information was obtained from the Guernsey authorities in the end of 2001; the latter came in March 2002. This latter group of documents revealed what had been hinted at in the 2001 documents: orchestration of a breathtaking tax evasion scheme by Stanley and Beatrice Tollman through the Channel bank accounts --- a scheme that also involved other members of the Tollman family, including their son Brett.

21  When we had made the initial request for assistance of the Guernsey authorities in or about July 2001, Stanley and Beatrice Tollman contested it through Guernsey lawyers and Colin Passmore of Simmons and Simmons. Shortly before the Guernsey judge made a ruling on the matter, the Tollmans' lawyers dropped their then-attempts to block the disclosure of the documents, and we started to get the documents on disc at end of 2001, when they conceded shortly before the ruling.

22  The second important development (in March 2002) was an interview we conducted in London of Arnold Tollman, Stanley Tollman's brother. We had originally taken testimony from him in May 2001, giving him effective immunity from prosecution. During his initial testimony, Arnold Tollman gave no hint of the activities in Guernsey disclosed by the documents received by us in December 2001 and March 2002. (We did not specifically ask Arnold Tollman about those documents, because we did not know about them at the time.)

23  In relation to the affairs of Paternoster, Arnold Tollman said he was asked to sign documents on behalf of that company by Sanford Freedman, but that he knew very little about them except that they involved debt purchases. In the fall of 2001 --- shortly after we made our requests for the Guernsey documents --- Arnold Tollman left the United States for Monaco, having sold his town house in the United States.

24  When we received the first documents from Guernsey, we caused to be issued and
served an extra-territorial subpoena on Arnold Tollman (a United States citizen),
but Arnold Tollman claimed he was too ill to travel back to the United States to
give evidence, as called for by the subpoena. Ultimately, Arnold Tollman agreed
to give evidence at the offices of Kingsley Napley, solicitors, in London.  I was
present, together with Christopher Murray of Kingsley Napley, Arnold Tollman, a
United States lawyer representing Arnold Tollman, and an FBI agent.

25  By agreement, this interview was tape recorded, and his lawyers were free to
disclose to others involved in the investigation, the nature and scope of the
questions and answers given by Arnold Tollman. Arnold Tollman was also free to
disclose publicly what he had said in the course of this interview. Confronted by
the relevant facts, Arnold Tollman during his interview confessed to his
involvement in a massive scheme to evade taxes through his receipt of unreported
income via Guernsey bank accounts.

26  In sum, he admitted having taken part in extensive tax crimes, which he
acknowledged was known at the top levels of The Travel Corporation. This
money was paid to Arnold Tollman, he swore, as a result of work he performed
for Trafalgar Tours USA, and included monies secretly paid to his Guernsey bank
account, as well as, later evidence revealed, $300,000 per year secretly siphoned
from the New York accounts of Trafalgar Tours USA. (Lawyers for Trafalgar
Tours USA now argue in ongoing proceedings that Arnold Tollman was not
pursuing these activities on behalf of the company, but as a frolic of his own.  I
develop this below.)

27  Following the receipt of the foregoing evidence, representatives from my office
met with attorneys for Stanley Tollman in New York in or about early 2002, prior
to the return of the 2002 indictment.  This meeting, customarily given to counsel
in cases of this sort, was consented to by our office as a result of a request for
such a meeting made by Mr. Tigue. During the meeting, Tigue and his partner,

9

Robert Morvillo, made an attempt to persuade us not to ask for an indictment, but we told them of the nature and extent of the Guernsey evidence, and that we would proceed with criminal charges.

28 The conversation with them turned to the question of sentence. We specified --- based on our then-current analysis of the evidence, which has since been subject to a more exacting analysis, particularly as it relates to the Guernsey evidence --- how many years Stanley, Beatrice, and Brett Tollman would likely be required to serve (as dictated by the then-governing United States Sentencing Guidelines), on the basis of the evidence then available to us, if the judge agreed with the agreement reached by prosecution and defence.

29 Stanley Tollman, we proposed, could plead guilty, and we could present a factual basis that, if accepted by the judge, would be in the approximate range of between six to seven years in prison. Beatrice and Brett Tollman would face lower sentences, but we maintained that, consistent with the Sentencing Guidelines, they would be required to serve sentences of imprisonment. Mr Morvillo, present with Tigue and an assistant, said (either at that point or a later point, when delivering Stanley Tollman's response to the offer), that he thought the sentence estimate was what he expected and not unfair. A day or two later, Mr Morvillo telephoned to say that his client would not accept it.

30 After the meeting with Stanley Tollman's lawyers, I met separately with Brett Tollman's lawyer, and Beatrice Tollman's lawyer, and had similar-type conversations, although not in as much detail.

31 Shortly after, we had discussions with Jack Tigue about whether Stanley Tollman would get bail if the grand jury returned an indictment. It was agreed that we would not oppose bail if Stanley Tollman would post (that is, pledge) as bail the three principal properties he and his wife occupied in the United States (and which were nominally held in Beatrice's name): the apartment in New York, the

10

farm in Connecticut, and the property in Palm Beach. Obviously, the consent of Beatrice Tollman had to be secured. We reached an agreement in principle and had exchanged copies of relevant bail-related documents that would effectuate the pledging of the properties, thus allowing for Mr. Tollman's freedom on bail pending resolution of his case.

32 On the day Stanley Tollman was scheduled to appear on April 24 2002 and to be arraigned, pursuant to discussions, and after I had been led firmly to believe that Tollman would attend the court proceedings, Jack Tigue telephoned me on 24 April, as I recount at paragraph 107 of my affidavit of October 2004, saying his client had refused to travel from London. Mr Tigue also told the court of this, and I asked for an arrest warrant, which is typical when a white collar or other defendant refuses to appear for a scheduled arraignment. Although Mr Tigue argued that issuance of a warrant was premature, the judge rejected his argument and issued the arrest warrant.

33 It is therefore not true for Stanley Tollman to suggest in paragraph 10 there was a prospect that he would be held without bail. He does not elaborate on his then "physical condition", to which he refers. Moreover, he does not square this suggestion with the fact that, as the Guernsey evidences makes clear, he had access to enormous amounts of money that could have been accessed to secure a bail package. (Indeed, as noted below, Brett Tollman had the Travel Corporation post approximately $17,000,000 in letters of credit as part of his bail package.)

34 I respectfully invite the court to bear in mind the above facts when it considers Stanley Tollman's assertions, for his example the contention (paragraph 27) "..it has become impossible for me to gather the evidence or recollect the detailed events that, I believe, demonstrate my innocence", and (paragraph 24) "…in the last five years, during which I have been forced to confine my whereabouts to the United Kingdom..".

11

Stanley Tollman's accusations of a "vendetta"

35 I know that since August 2004 Stanley Tollman has made very serious allegations in the London court about my conduct as prosecuting attorney in New York, and about the conduct of the prosecuting extradition lawyers in London. He has personally accused me, through his London lawyers of lying and perjury, of acting maliciously, and I am told that on three occasions at a two-day hearing in November 2006, Mr James Lewis QC, appearing for Beatrice Tollman, with the support of the two barristers appearing for Stanley Tollman, Clive Nicholls QC and Hugo Keith, accused me of "blackmail".

36 I did not expect that the personal attack upon me would be renewed at the passage of time hearing, but Stanley Tollman again accuses me of very serious misconduct in his present statement (see paragraphs 17-24), asking the court to take this into account, as does the written argument presented on his behalf (paragraph 50).

37 As noted above, Stanley Tollman has levelled against me the very serious allegation of "blackmail". I notice that no evidence of any kind is presented in furtherance of the "blackmail" allegation, which I invite those who made it to withdraw or substantiate it with evidence; Mr Webster does not refer to the "blackmail allegation, or the false allegation made by Stanley Tollman at paragraph 18 that I would "pressurise" Mr Tollman "by attacking his family".

38 I note also that none of the witnesses to be called on Stanley Tollman's behalf refers to the false "perp walk" allegation, which Mr Tollman says at paragraph 19 is "detailed elsewhere". I respectfully request that Mr Tollman's lawyers be required to substantiate this comment (which they cannot, because it was never said) or withdraw it.

39  Stanley Tollman criticises my conduct towards Brett Tollman (paragraphs 20-21). Following the issuance of the arrest warrant for Stanley Tollman, we were unaware of the whereabouts of Brett Tollman, whose New York attorneys never contacted us to inform us that, unlike Stanley Tollman (who decided to run rather than fight the United States charges, thus becoming, under United States law, a fugitive) Brett Tollman intended to address any charges against him. We thus obtained a sealed (that is, not public) arrest warrant.

40  Unbeknownst to us, Brett Tollman had been in London with Stanley Tollman when the charges against Stanley Tollman were voted by the grand jury, but he returned (again, without our knowledge) to New York in or about late April or May 2002.  When we learned that Brett Tollman had been seen in or around his apartment at 485 Park Avenue, IRS agents effectuated his arrest near his home on Park Avenue. Again, the point that requires emphasis is that Brett Tollman's New York attorney never informed us that he returned to the United States, nor did the New York attorney contact us after Stanley Tollman fled and indicate that Brett was prepared to surrender on any charges.

41  Brett Tollman was arrested, quite simply, because we feared he might leave the country, or simply follow the course taken by Beatrice Tollman --- who, although in the United States when Stanley Tollman was charged in April 2002, fled the United States and all of her properties here in May 2002 and joined her husband in London. (She has not returned since, although she is aware of the arrest warrant outstanding for her.)

42  Following Brett Tollman's arrest on Park Avenue, he was kept, like any arrested person arrested too late in the day to be brought before a court, in a Federal Detention Centre. His arrest was not timed deliberately to ensure that he spent a night in prison. The next day he was ordered by a Magistrate Judge to be released on secured bail of $25m, which I recall was provided or promised within forty-eight hours; seventeen million dollars of that bail was ultimately posted by The

Travel Corporation (the company controlled by Stanley Tollman), via irrevocable letters of credit we accepted. Indeed, we agreed in Court to allow Brett Tollman to be released even before all of the security --- including the letters of credit --- was actually posted securing his release.

43  Brett Tollman pleaded guilty to a charge which did not implicate others directly. He indicated he would plead guilty in September 2003, just before I was due to travel to Guernsey for the important but straightforward purpose of ensuring that the Guernsey material was put into admissible form for Brett Tollman's then-scheduled September 2003 trial. We were due to take the evidence of Michael Evans and John Lord (the latter of whom did the day-to-day bookkeeping of The Travel Corporation, Trafalgar Tours International, and affiliated companies). They did not give evidence at trial, because Brett Tollman pleaded guilty, it was therefore unnecessary to authenticate their evidence. All these witnesses, who were represented by counsel, had previously made statements in relation to these matters.

44  Brett Tollman agreed that his tax evasion offence involved not only evasion of his own income taxes but, in addition, evasion of taxes owed by others, who participated in the evasion scheme and therefore was "foreseeable" to him. Although pressed at his sentencing to identify who those "others" were, Brett Tollman refused to do so, although his attorneys acknowledged in Court that the United States authorities took the position that the "others" were Stanley and Beatrice Tollman. After being sentenced in March 2004 and being allowed to self-surrender to his incarceration facility in May 2004 (which the United States levelled no opposition to), Brett Tollman was returned to New York at my request (and pursuant to a grand jury subpoena) to give evidence in front of grand jury.

45  In travelling to New York as a prisoner then under federal sentence, he was treated as any other prisoner would be. When Brett Tollman requested that he be given special privileges for his return trip to his facility --- that is, be allowed to

14

travel via private air carrier, my initial position was that he should not be allowed special privileges; in other words, he should be treated like every other prisoner, regardless of social or financial status. My Office ultimately permitted Brett Tollman, however, to return to his facility via private carrier, provided that Tollman pay for his travel back and for the expenses of the marshals who accompanied him.

46  I believe we have treated Brett Tollman fairly. The Judge that sentenced him imposed a two-year period of supervised release when his prison term ended. We have informed the Judge that sentenced him that we "take no position"--- that is, we do not object --- to the termination of this period after 18 months. We have not objected to international travel he wanted to make during this period. We have had no input into the decision of the United States Probation Office --- which is an arm of the United States Courts and not the Department of Justice --- to forbid him to speak to his parents, something I was informed of only very recently.

47  At paragraph 22, Stanley Tollman refers to my treatment of Gavin Tollman. I disagree with many of the factual comments and findings made by Judge Molloy in Canada. Because this matter is ongoing, I do not comment on this matter at length. Suffice it to say that there has been no criticism of me by any of my seniors with respect to this matter. Moreover, the approach taken with respect to Gavin Tollman in Canada was discussed with appropriate officials at the Office of International Affairs in Washington D.C., who must be consulted on matters like this. They suggested, and assisted in implementing, the approach that we took, which is an approach taken in other extradition matters and, more to the point, does not violate any United States law or practice.

48  As noted above, I make no detailed comment about Gavin Tollman's present position, because we are in contact with his lawyers about the next steps that will be taken. He is now in the United Kingdom at present with no legal restraint. When he was preparing to leave Canada and travel to the United Kingdom, we

confirmed for his lawyers, at their request, that there was no Interpol red notice requesting his arrest. We did this as a courtesy because we were and are in discussions with them.

49  I have dealt in large measure with our conduct towards Arnold Tollman, to whom Stanley Tollman refers at paragraph 23. In the autumn of 2003, we issued another extra-territorial subpoena (approved by a United States District Court Judge), to present Arnold Tollman's evidence at the trial of Stanley Tollman's co-defendants. In response to the subpoena, Arnold Tollman claimed through his attorneys that he was too ill to give evidence in the United States or Monaco. The United States District Judge, on my application, held him in contempt of the subpoena. As a result of the contempt, the Judge imposed fines on Arnold Tollman, and at a daily rate for so long as he was in contempt. We ultimately agreed to the lifting of all the contempt fines, which were accruing daily, on condition that we retained the doctor who would conduct a medical examination. At that stage, Arnold Tollman agreed to such an independent examination.

50  This doctor, after the examination, told us there was a significant risk to Arnold Tollman's health if he gave evidence. We therefore agreed that the contempt fines would be remitted. It was a disappointment for the prosecution that we could not obtain the evidence of Arnold Tollman at trial. None of the defendants at the 2003-4 trial showed any enthusiasm at all for calling Arnold Tollman at all, which did not surprise me in the light of his extensive confession of March 2002 and his other activities in assisting Stanley Tollman in effectuating the bank fraud conspiracy by acting as the "straw" or "nominee" owner of Paternoster.

51  Given Arnold Tollman's role with Paternoster and his activities as an evader of millions of dollars of taxes owed in the United States, the notion that Stanley Tollman would seek to call Arnold Tollman at his trial as a witness, were he still alive, is utterly absurd.

16

52  I cannot deal with the "overwhelming pressure on me to waive my right to contest these proceedings", to which Stanley Tollman refers at paragraph 89, because he does not say what it is, nor how he has resisted it, even though it is "overwhelming".

<u>Prejudice at trial</u>

53  I have already dealt with a number of aspects of the defence contention, above. I wish to make two further general comments about the suggested difficulty of proving or disproving the conspiracy to defraud the banks, to which Stanley Tollman and his witnesses refer at length.

54  The first is that there is no substantial material assembled by the prosecution which was not disclosed at the 2003-4 trial. The prosecution sought, at that trial, to prove Stanley Tollman's guilt as a co-conspirator . Although we attempted to do so, we did not adduce evidence of Mr Tollman's flight, as the District Judge found that the evidential value of that flight was substantially outweighed by the prejudice its admission would cause to the co-defendants. Otherwise, we used the evidence we had to prove Stanley Tollman's guilt, as a co-conspirator.

55  Secondly, the existence of the bank fraud conspiracy was a key issue at the 2003-4 trial. Although the lesser defendants concentrated on the question whether they were involved in any conspiracy, if one existed, the issue was at the centre of the defences of Hundley, Cutler and Freedman. Whether the banks were *in fact* deceived, or whether various representations of fact were made, was put squarely in issue, even though, of course, in a conspiracy charge, it is in fact unnecessary to show that the alleged victims were in fact deceived by false representations considered by the conspirators to be material.

56  The various arguments as to whether there was a conspiracy by Mr Tollman's witnesses were developed and argued by highly respected and skilled lawyers (no defendant gave evidence in his own defence).    After considering all of the defendants' arguments, the jury returned verdicts of guilty on the bank fraud conspiracy charge against all four defendants who proceeded to trial, as shown in my affidavit of October 2004.

57  It will be submitted in support of this extradition request that the court should take the verdicts of the jury into account in determining whether a trial of this issue would now be unfair.   The jury found guilt proved beyond reasonable doubt.

58  It is the near-universal practice of defendants convicted at trial in complex white-collar cases to pursue an appeal of the jury's verdict. Monty Hundley has declined to pursue an appeal against either conviction or sentence, which I suggest is a strong indication that any appeal seeking to challenge the conspiracy conviction would be an exercise in futility. Cutler, too, has elected not to challenge the jury's verdict against him. Freedman is appealing his conviction (although he chose to appeal only after the United States first filed papers indicating it would appeal Freedman's sentence), seeking to argue among other things that there was an insufficiency of evidence to convict of conspiracy to defraud.

59  No one argues that the judge gave defective instructions to the jury on the law of conspiracy.    Zuckerman, in his appeal, explicitly concedes in his appeal documents that there was a conspiracy to defraud, in a document which I assume Mr. Webster and Mr. Patrusky have seen,  as follows:

> "There can be little dispute that the government presented a forceful case to demonstrate that a number of TH executives perpetrated a lengthy and intricate fraud on several banks and the IRS.    By engaging in what was essentially a "shell game", those executives led numerous bank employees to mistakenly believe that Stanley Tollman and Monty Hundley were virtually destitute and that the companies they controlled were on the brink of collapse.    At the same time, those same executives defrauded the

18

> IRS by failing to report millions of dollars in income that resulted from the cancellation of debts previously owed to those banks. However, while the evidence against his co-defendants was compelling, the case against the appellant, an employee who had no apparent discretion in any of the fraudulent transactions perpetrated by his employer......."

60  If Stanley Tollman really does intend to plead not guilty, and to put this in issue, his lawyers will be in exactly the same position as the defendants who chose to stand trial, except that Tollman's lawyers will have the additional advantage of being able to call all the convicted defendants, who have lost their Fifth Amendment rights by virtue of their convictions; alternatively, Stanley Tollman will be able to throw all the blame on the convicted, absent, defendants, who, he may argue, perpetrated frauds in the frequent absences of Stanley Tollman, as proved by the witnesses referred to above.

61  The prosecution accepts that Mr Tollman was, to a certain extent, less involved in the detailed discussions with the bank than other defendants, though he did attend a number of critical meetings, as the documents disclose. He did indeed spend a portion of his time travelling between his various homes in the United States, in entertaining, and regular international travel.

62  At paragraph 35-40, Stanley Tollman refers to a person named Hausman, whom Tollman says died in 1997. I currently cannot recall who this person is and cannot say that his name has ever arisen in connection with the IRS or grand jury investigations. While I cannot categorically state that this name does not appear anywhere in the trial documents, I can state that I have absolutely no recollection of this name arising at any time. More to the point, because this person has evidence that is entirely historical and unrelated to the bank negotiations, the relevance of any evidence he could have given escapes me completely.

63  I have not commented on a number of other aspects of Mr Tollman's evidence which will be criticised in argument.

19

64  If Mr Patrusky is right, Stanley Tollman will not be prejudiced at trial by the passage of time: he will be acquitted. Mr Patrusky's considered opinion, based on the evidence called at the 2003-4 trial, and all the documents he has seen is this (page 15):

> "I consider it unlikely that he was ever part of any conspiracy to defraud the banks, not least because I cannot see that he had made any representations to the banks."

65  I note that the defence written argument refers to this evidence in paragraph 2. If the opinion is correct, the jury will not find Stanley Tollman guilty beyond reasonable doubt. We, of course, take strong issue with Petrusky's statements because they simply and inexplicably ignore the evidence. Indeed, his statement suggesting that Stanley Tollman made no representations to the banks is flat-out wrong. In fact, in each of the bank indebtedness purchases, Stanley Tollman was required to --- and did in fact --- make written representations. Indeed, Stanley Tollman's unsworn "statement" addresses how he believes his representation to Bank of America (to the effect that he had not provided Paternoster the money to effectuate the Bank of America debt purchase) was not, in his view, false because he had allegedly consulted an un-named lawyer about what degree of connectedness the funds could have before they were deemed Stanley Tollman's funds. A United States jury, of course, should decide whether Stanley Tollman possessed the requisite knowledge and intent in this regard.

66  Mr Patrusky has acted for the company Trafalgar Tours USA and performed various and detailed forensic analyses. He knows from those analyses, for instance, that Arnold Tollman on an annual basis took out of Trafalgar Tours USA 25,000 dollars every month for eight to ten years and sent it to personal accounts. He gave no direction as to what it was for; he simply had unfettered control to effectuate those transfers. To obtain reimbursement of these monies, Trafalgar Tours USA invoiced Travel Tours International or the Travel Corporation (in Europe) and sent reimbursement for Arnold Tollman's withdrawals, which were reflected on the various accounting records through the

20

cryptic description "funds drawn locally". The accounting records of certain of the Trafalgar and/or Travel Corporation records would refer to these payments as "AT" --- "funds drawn locally".

67 Mr Patrusky analysed the aforementioned payments when he made presentations to us, in the hope that we would not prosecute Trafalgar Tours USA. He could not explain these payments, but the company's position is that Arnold Tollman was doing this without authorization, and that the company is not responsible. Mr Patrusky's position is, in effect, that Arnold Tollman was acting criminally and ultra vires, and deceiving the company that Mr Patrusky represents.

68 Arnold Tollman assisted his son, Gavin Tollman, in carrying out tax evasion activities. Arnold Tollman opened up Guernsey bank accounts bank accounts for his three children; two daughters, and Gavin. One of the charges against Gavin is that between 1995 and 1997, he received, while working for the T-H Hotels Group in the United States, a total of about $130,000, on which he has not paid tax. In 1997 Gavin Tollman succeeded Richard Masefield as President of Trafalgar Tours USA ("TT USA"). At the time, Arnold Tollman was Chairman of the company. When Gavin joined TT USA he started to receive money in a Guernsey bank account that his father had opened for him but which money emanated from accounts of The Travel Corporation and its related companies. These additional sums, received and used by Gavin Tollman through certain accounts that Arnold Tollman caused to be opened, totalled approximately $900,000.

69 Gavin Tollman's defence is that his father opened the accounts and it was his father's money, not his own, and that he had gifted it to Gavin Tollman. This money, however, came out of Travel Corporation-related accounts used for payment of salaries and compensation to employees and officers and owners of various Travel Corporation-related companies. In addition, the money came from those accounts at the time Gavin Tollman was performing work and other services

21

for The Travel Corporation and its related companies. Mr Patrusky is aware of many of the United States' allegations in this regard (and, indeed, the documents that back it up), and would be unlikely to recommend calling Arnold Tollman, were he still alive, in Stanley Tollman's defence.

70  This witness statement is true.

Signed: *Stanley J. Okula, Jr.*

Dated:  *25 February 2007*

22